2011 ME 11

Katie GNIADEK

v.

CAMP SUNSHINE AT SEBAGO LAKE, INC., et al.

Supreme Judicial Court of Maine.

Argued: Sept. 14, 2010.
Decided: Jan. 13, 2011.

Marc N. Frenette, Esq. (orally), Skelton, Taintor & Abbott, Auburn, ME, for Katie Gniadek.

Thomas S. Marjerison, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, ME, for Camp Sunshine at Sebago Lake, Inc.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1] In 2005, Katie Gniadek attended Camp Sunshine at Sebago Lake and met Michael Newton, a volunteer counselor. More than two months after Gniadek left the Camp, Newton sexually assaulted her. At issue on appeal are Gniadek's claims that (1) Camp Sunshine's negligence led to the sexual assault, and (2) the Camp is

vicariously liable for Newton's conduct. Because we conclude that Gniadek cannot succeed on either claim, we affirm the summary judgment entered in the Superior Court (Cumberland County, *Cole, J.*) in favor of Camp Sunshine.

## I. FACTS AND PROCEDURE

[¶ 2] Camp Sunshine, a non-profit corporation,[1] provides a traditional summer camp experience for children with chronic or life-threatening illnesses and their immediate families, and offers support to help families cope with the impact of having an ailing child. The Camp runs week-long sessions throughout the summer, with each week devoted to children having a specific diagnosis.[2] To attend a session, children should be in their usual state of health and must be accompanied by a parent or guardian, who will lodge with them. The Camp does not provide medical care to the campers beyond "camp medicine" or first aid.

[¶ 3] Michael Newton, who at fifty-eight years of age had no prior experience working with children, first applied to be a Camp volunteer in 2005. After contacting Newton's two listed references and receiving favorable feedback, the Camp assigned him to volunteer for eleven weeks.

[¶ 4] During the week of August 21 to 26, 2005, an eighteen-year-old female volunteer complained to the Camp director that she was uncomfortable with Newton's conduct toward her. She elaborated that Newton had stopped by her room, brought her a gift, invited her to lunch or for ice cream, and talked about his girlfriend's daughter. The director recommended that she limit her contact with Newton. He then spoke with Newton about the female volunteer's concerns. Newton admitted to giving her a gift but asserted he had done the same with others and explained his actions as trying too hard to be friendly.

[¶ 5] After these meetings, the director requested a criminal background check and a driver's history check on Newton, which both came back clean. He also asked Newton's supervisor if she had seen Newton doing anything unusual; she reported that she had not. No other instances of inappropriate conduct towards campers were brought to the Camp's attention. Although one volunteer had apparently observed Newton patting young females on the buttocks and rubbing their shoulders, the volunteer did not report this to Camp officials.

[¶ 6] Gniadek, who was seventeen at the time, attended Camp during the week of September 3 to 9, 2005, with her mother, Kimberly Cooper–Morin.[3] Gniadek had been attending Camp annually since 2001 and, over the years, she had taken part in two or three fundraising events on the Camp's behalf. Because of Gniadek's prior Camp participation, she was acquainted with some returning staff.

[¶ 7] During their week at Camp, Gniadek and Cooper–Morin met Newton, who was serving as a volunteer teen counselor. On Gniadek's last day, Newton gave her a card and gift, and asked if they could stay in touch. Gniadek agreed, and Newton gave her his contact information. Gnia-

---

1. Camp Sunshine's insurance policy potentially would provide coverage for Gniadek's claims.

2. We refer to Camp Sunshine's practices in 2005, which may differ from its current practices.

3. Both Gniadek and Cooper–Morin submitted applications to attend Camp that disclosed their medical histories and prescription medications. Thus, the Camp had information revealing that Cooper–Morin had previously experienced a head injury and that Gniadek had been prescribed anti-depressants.

dek, Cooper–Morin, and Newton also obtained copies of the contact lists for that week compiled by the Camp, which recorded the name, address, and phone number of the counselors and parents in attendance. The Camp had begun assembling these lists at the request of campers' families, and inclusion on the list was voluntary for parents. Cooper–Morin's contact information was on the parent-camper list.

[¶ 8] After leaving Camp on September 9, Gniadek had no contact with Newton until November 23, 2005, when he called to invite her to go with him to New York to visit a family who had attended Camp. During their conversation, Gniadek learned that Newton was finished volunteering at Camp for 2005. Gniadek obtained her mother's permission and agreed to go on the trip. Camp Sunshine had no knowledge of these plans.

[¶ 9] On November 25, Newton notified Gniadek that he was going to New York that day. Newton picked Gniadek up between 5:30 and 6:30 p.m., and they left Gorham for New York. Gniadek and Cooper–Morin believed that there were two possible places where Gniadek and Newton would be staying that night, and both were the homes of former Camp volunteers in New York. However, neither Gniadek nor Cooper–Morin had contacted these volunteers about this trip.

[¶ 10] Instead of staying with other volunteers, Gniadek and Newton stopped at a Connecticut motel. During the night, Newton sexually assaulted Gniadek.

[¶ 11] Newton was charged with sexual assault in the second degree. He entered an Alford plea[4] to a charge of sexual assault in the third degree in the Connecticut Superior Court and was sentenced to five years in jail, all but eighteen months suspended, and ten years of probation.

[¶ 12] The Camp was not operating or sponsoring any sessions in Maine on November 25 to 26, 2005. And, at that point, Gniadek had not yet applied to attend Camp in 2006. The Camp had received Newton's 2006 volunteer application but had not acted on it. After learning about the sexual assault, the Camp sent Newton a letter informing him that his "volunteer services [were] no longer needed at Camp Sunshine." The letter also instructed him not to "solicit, recruit, speak on behalf of, or represent Camp Sunshine."

[¶ 13] In 2008, Gniadek filed a complaint in the Superior Court naming Camp Sunshine and Newton as defendants. With respect to the Camp, Gniadek alleged negligence, negligent hiring/supervision, negligent retention, breach of fiduciary duty, and vicarious liability. At the close of discovery, the Camp filed a motion for summary judgment on all counts. The court granted the Camp's motion, finding that the Camp (1) owed no duty to Gniadek at the time of the sexual assault, and (2) could not be held vicariously liable.

[¶ 14] Newton did not file an answer to the complaint and has not participated in this litigation. After the court granted summary judgment, Gniadek filed an unopposed motion for entry of a final judgment as to Camp Sunshine, pursuant to M.R. Civ. P. 54(b), and she requested that the proceedings on her complaint against Newton be stayed pending this appeal. The court granted the motion and entered final judgment on all claims in favor of Camp Sunshine.

---

4. *See North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) ("An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.").

## II. DISCUSSION

[¶ 15] We review a grant of summary judgment de novo, considering the evidence and the reasonable inferences that may be drawn from the evidence in the light most favorable to the non-moving party. *N. Star Capital Acquisition, LLC v. Victor*, 2009 ME 129, ¶ 8, 984 A.2d 1278, 1280. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Picher v. Roman Catholic Bishop of Portland*, 2009 ME 67, ¶ 7, 974 A.2d 286, 289.

[¶ 16] Gniadek argues that summary judgment was improper because the court erred as a matter of law in determining that (A) Camp Sunshine did not have a duty to protect her against Newton's intentional criminal conduct, and (B) Camp Sunshine was not vicariously liable for Newton's actions.[5]

### A. The Existence of a Duty

[¶ 17] The existence of a duty and the scope of that duty are questions of law. *Alexander v. Mitchell*, 2007 ME 108, ¶ 14, 930 A.2d 1016, 1020. Duty refers to whether the defendant is "under any obligation for the benefit of the particular plaintiff." *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 11, 738 A.2d 839, 844 (quotation marks omitted); *see also Alexander*, 2007 ME 108, ¶ 16, 930 A.2d at 1020 (identifying the considerations relevant to determining the existence of a duty). Ordinarily, individuals have no duty to protect others from the criminal conduct of a third party. *See Bryan R.*, 1999 ME 144, ¶ 12, 738 A.2d at 844. There are, however, exceptions to this general proposition. An actor has a duty to protect those with whom he stands in a special relationship and those facing harm created by the actor. *See id.* ¶ 14, 738 A.2d at 845; *Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶ 25 n. 5, 871 A.2d 1208, 1217–18.

[¶ 18] Gniadek asserts that both exceptions apply here. She contends that the Camp had a special relationship with her, in the form of a fiduciary relationship and a custodial relationship, which gave rise to a duty under the tort of negligent supervision. *See Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶¶ 16, 18–19, 970 A.2d 310, 315–16 (providing the elements of a negligent supervision claim and recognizing five types of special relationships). Gniadek points to her age, chronic illness, use of anti-depressants, and involvement in the Camp to argue that the Camp had a fiduciary relationship with her, and relies on the time she spent at Camp to argue that the Camp also had a custodial relationship with her. She also contends that the Camp affirmatively created the risk to her from Newton by compiling and distributing contact lists when industry standards discourage out-of-session contact between counselors and campers due to the risk of sexual assault.[6] We first address whether

5. Gniadek also contends that the Superior Court erred in stating that it would "assume that Camp Sunshine had a duty to protect [C]amp attendees on its premises from potential predators," but not permitting a jury to decide whether Camp Sunshine had breached this duty proximately causing harm to Gniadek. Because the existence of a duty and the scope of a duty are questions of law, *Alexander v. Mitchell*, 2007 ME 108, ¶ 14, 930 A.2d 1016, 1020, the court could properly conclude that the scope of the duty owed to Gniadek was limited. *See also Howe v. Stubbs*, 570 A.2d 1203, 1203–04 (Me.1990) (holding that, in the circumstances of that case, the duty owed to business invitees did not require the defendant to either warn of or protect against the plaintiff's injury). We do not disturb this conclusion.

6. Gniadek makes several other arguments for the existence of a duty. However, contrary to Gniadek's contention, we are not compelled by policy considerations to create a duty in

a special relationship exists and then turn to whether the Camp's affirmative acts gave rise to a duty.

### 1. Special Relationships for a Negligent Supervision Claim

#### a. Fiduciary Relationship

[¶ 19] A fiduciary relationship exists where "the law will recognize both the disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue." *De-Cambra v. Carson*, 2008 ME 127, ¶ 13, 953 A.2d 1163, 1166 (quotation marks omitted). But not all fiduciary relationships are special relationships; only those where there is a "great disparity of position and influence between the parties" will suffice. *Dragomir*, 2009 ME 51, ¶ 19, 970 A.2d at 316 (quotation marks omitted). We make this determination on a case-by-case basis, "unless the nature of a given relationship is such that there is always certain to be a great disparity of position and influence." *Id.*

[¶ 20] In two instances we have found that, in light of the circumstances, a plaintiff's relationship to the defendant was marked by a "great disparity of position and influence between the parties." *See id.* ¶ 21, 970 A.2d at 316; *Fortin*, 2005 ME 57, ¶ 34, 871 A.2d at 1220. In *Fortin*, the plaintiff, who had been sexually assaulted by his childhood priest, alleged that the Diocese was liable for negligent supervision. 2005 ME 57, ¶¶ 3, 16, 31, 871 A.2d at 1212, 1215, 1219. When the abuse began, Fortin was a parochial school student and altar boy under the daily supervision, control, and authority of the Diocese. *Id.* ¶ 34, 871 A.2d at 1220. We distinguished Fortin's relationship with the Diocese from

that of an individual who could assert only a "general membership" in an organization and concluded that the established and close connection between Fortin and the organization signaled a special relationship. *Id.* ¶¶ 32, 34, 37, 871 A.2d at 1219–20, 1222.

[¶ 21] Similarly, a patient with a serious mental condition and the hospital providing him with treatment may have a fiduciary relationship marked by a "great disparity of position and influence." *Dragomir*, 2009 ME 51, ¶ 21, 970 A.2d at 316 (quotation marks omitted). In *Dragomir*, while the plaintiff was receiving treatment from a hospital for schizophrenia and substance abuse, he and his social worker began a sexual relationship. *Id.* ¶¶ 2, 3, 21, 970 A.2d at 312, 316. As a vulnerable and impaired patient receiving intensive treatment from the hospital, Dragomir was able to allege facts sufficient to establish a special relationship. *Id.* ¶ 21, 970 A.2d at 316.

[¶ 22] In the instant case, the Camp did not have a fiduciary relationship with Gniadek that amounts to a special relationship as we have defined it. Dating back to 2001, Gniadek spent one week each year at Camp Sunshine. Outside of this contact, she elected to participate in, at most, three fundraising events to benefit the Camp. Gniadek also maintained a social relationship with some campers, volunteers, and staff. Ultimately, her relationship with the Camp was indistinguishable from that of other campers.

[¶ 23] Further, although the Camp provided Gniadek with a distinct and beneficial service, it did not exercise influence over her as the Diocese did in *Fortin* or as the hospital did in *Dragomir*. Gniadek's

---

this case. And, because we conclude that her arguments based on sections 308 and 323 of the Restatement (Second) of Torts (1965) are

without merit, we do not discuss them further.

chronic illness and use of anti-depressants, and Cooper–Moon's head injury establish that Gniadek was vulnerable. But the Camp had a limited presence in Gniadek's life, one that was not marked by "a great disparity of position and influence between the parties." *Dragomir*, 2009 ME 51, ¶ 19, 970 A.2d at 316 (quotation marks omitted).

### b. Custodial Relationship

[¶ 24] A custodial relationship exists between "those who are required by law to take physical custody of another or who voluntarily do so, 'such as to deprive the other of his normal opportunities for protection.'" *Id.* ¶ 18, 970 A.2d at 316 (quoting Restatement (Second) of Torts § 314A (1965)). Ordinarily a child who is in school or at camp "is deprived of the protection of his parents or guardian. Therefore, the actor who takes custody … of a child is properly required to give him the protection which the custody or manner in which it is taken has deprived him." Restatement (Second) of Torts § 320 cmt. b (1965).

[¶ 25] The scope of the duty arising from a custodial relationship is circumscribed by temporal and geographic limitations. *See id.* § 314A cmt. c. A duty exists only where the special relationship is intact and the risk of harm, or further harm, arises in the course of that relation. *Id.* Thus, "[a] carrier is under no duty to one who has left the vehicle and ceased to be a passenger, nor is an innkeeper under a duty to a guest who is injured or endangered while he is away from the premises. Nor is a possessor of land under any such duty to one who has ceased to be an invitee." *Id.; see also Mastriano v. Blyer*, 2001 ME 134, ¶ 17, 779 A.2d 951, 955 (explaining that a cab driver had no duty to a passenger after the passenger made a safe exit in a safe place); *Marquay v. Eno*, 139 N.H. 708, 662 A.2d 272, 281 (1995) (stating that school officials' duties based on special

relationships with students "will not ordinarily extend beyond graduation"); *Young v. Salt Lake City Sch. Dist.*, 52 P.3d 1230, 1231, 1233–35 (Utah 2002) (holding that a school owed no duty to an elementary school student hit by a car while riding his bicycle to a mandatory school conference).

[¶ 26] Gniadek attended Camp Sunshine with her mother and was not deprived of her mother's protection while at Camp. Even overlooking this fact, there was no custodial relationship at the time of the assault. Gniadek and Cooper–Morin left Camp Sunshine over two months before Newton sexually assaulted Gniadek.

[¶ 27] Because Gniadek has failed to establish that she had a special relationship with the Camp, we do not go on to consider the other requirements for negligent supervision liability. *See Dragomir*, 2009 ME 51, ¶ 16, 970 A.2d at 315.

### 2. Misfeasance by Camp Sunshine

[¶ 28] Gniadek relies on the Restatement (Second) of Torts § 302B (1965) comment e(D) to support her claim that the Camp affirmatively created a risk to her by compiling and distributing contact lists. Although the law may impose a duty to protect someone from the danger created by the defendant, *see Bryan R.*, 1999 ME 144, ¶ 14, 738 A.2d at 845, we have not expressly adopted section 302B. That section defines what constitutes a negligent act where a third party inflicts the harm. It states: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." Restatement (Second) of Torts § 302B.

[¶ 29] An actor is required to guard against the intentional misconduct of oth-

ers "where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account." *Id.* § 302B cmt. e. For example, "[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct," the actor may be negligent. *Id.* § 302B cmt. e(D). In assessing the applicability of this principle, factors to be considered are

> the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take.

*Id.* § 302B cmt. f.

[¶ 30] Other courts have found the "peculiar[ ] likel[ihood]" and the "peculiar opportunity" described in section 302B comment e(D) when a wife encouraged children to use her swimming pool while her husband supervised, knowing her husband had molested children in the past, and her husband molested some of these children, *Pamela L. v. Farmer*, 112 Cal. App.3d 206, 169 Cal.Rptr. 282, 283–84 (1980), and when the police disclosed an assault victim's name and address to the newspaper without her consent and before the assailant was arrested, and the victim was terrorized by the assailant on seven occasions after publication of the information, *Hyde v. City of Columbia*, 637 S.W.2d 251, 253, 257–58 (Mo.Ct.App.1982); *see also Golden Spread Council, Inc. No. 562 of the Boy Scouts of America v. Akins*, 926 S.W.2d 287, 289, 290–92 (Tex. 1996) (holding that a duty may exist where a boy scout troop recommended a scout master to another organization after learning he had been "messing with" some boys, and the scout master went on to commit further sexual abuse).

[¶ 31] Newton's known character, past conduct, and tendencies did not include conduct demonstrating a particularly high risk that he would sexually assault a camper. His interaction with the female volunteer counselor was insufficient to establish that he posed a "peculiar risk" of committing a sexual assault, and the Camp was unaware of the allegation that he patted young females on the buttocks and rubbed their shoulders. Moreover, making available a contact list that included Cooper–Morin's contact information did not create a "peculiar opportunity" for misconduct. It is nowhere alleged that Newton could not have obtained Cooper–Morin's phone number even without the contact list had he wanted to reach Gniadek after they met at Camp. Further, Cooper–Morin consented to inclusion on the contact list.

**B. Liability under Agency Theory**

[¶ 32] Gniadek contends that Newton committed his tort under the apparent authority of the Camp. She further argues that whether the Camp knowingly or negligently held Newton out as possessing the authority to act for it is a question of fact for the jury, and therefore summary judgment on this claim was improper.

[¶ 33] "Apparent authority is authority which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing. Apparent authority exists

only when the *conduct of the principal* leads a third party to believe that a given party is [its] agent." *QAD Investors, Inc. v. Kelly,* 2001 ME 116, ¶ 19, 776 A.2d 1244, 1250 (quotation marks omitted). Termination of actual authority will not alone end the apparent authority held by an agent. Restatement (Third) of Agency § 3.11(1) (2006). Instead, apparent authority ceases when it becomes unreasonable for the third party to believe that the agent continues to act with actual authority. *Id.* § 3.11(2)

[¶ 34] The Restatement (Third) of Agency § 7.08 specifically addresses tortious liability for acts of agents cloaked with apparent authority. That section states:

> A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission.

Restatement (Third) of Agency § 7.08 (2006). The commentary explains that section 7.08 applies to torts such as "fraudulent and negligent misrepresentation[ ], defamation, tortious institution of legal proceedings, and conversion of property obtained by an agent purportedly at the principal's direction." *Id.* § 7.08 cmt. a. In the commission of these torts, there must be a "close link between an agent's tortious conduct and the agent's apparent authority" in order for the principal to be liable. *Id.* cmt. b. "Thus, a principal is not subject to liability when actions that an agent takes with apparent authority, although connected in some way to the agent's tortious conduct, do not themselves constitute the tort or enable the agent to mask its commission." *Id.*

[¶ 35] Our interpretation of a predecessor to section 7.08 recognized similar limitations. In *Mahar v. StoneWood Transport,* we interpreted the Restatement (Second) of Agency § 219(2)(d) (1958) as "limited in its application to cases within the apparent authority of the employee, or when the employee's conduct involves misrepresentation or deceit." 2003 ME 63, ¶ 21, 823 A.2d 540, 546. Although we had not "expressly adopted" that section, we nonetheless explained that it would not encompass assaultive and threatening conduct by an employee who did not purport to act on his employer's behalf *Id.* ¶¶ 20, 24, 823 A.2d at 545–46.

[¶ 36] Here, when Newton invited Gniadek to accompany him on a trip to New York, he told her that he had finished with Camp. By this statement, he conveyed that he was no longer acting with the actual authority of Camp Sunshine. Even assuming that after learning this, it would still be reasonable for Gniadek to believe that Newton acted on behalf of Camp Sunshine, the sexual assault was not committed with apparent authority. Newton's conduct does not fall within the scope of section 7.08.

### III. CONCLUSION

[¶ 37] In summary, we hold that Camp Sunshine had no duty to protect Gniadek at the time that Newton sexually assaulted her and that Newton was not acting with apparent authority at the time he committed the tort. Accordingly, the Superior Court did not err in granting summary judgment to Camp Sunshine on Gniadek's claims against the Camp.

The entry is:

Judgment affirmed.