MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:     2013 ME 108
Docket:       Yor-13-46
Argued:       October 9, 2013
Decided:      December 10, 2013

Panel:        SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR,
              JJ.

TIMOTHY BELL, BY HIS PARENT AND NEXT FRIEND, TERESA BELL

v.

RANDALL DAWSON et al.

ALEXANDER, J.

[¶1]    This appeal comes to us following an incident in which then-thirteen-year-old Timothy Bell was seriously injured when he skateboarded out of Randall and Rose Dawson's driveway and was struck on the roadway by a moving vehicle.  Teresa Bell, on behalf of her son, Timothy, appeals from a summary judgment entered in the Superior Court (York County, *Fritzsche, J.*) in favor of the Dawsons on Bell's claims that Timothy's injuries were caused by the Dawsons' negligent supervision and by the Dawsons' negligently creating or allowing what Bell characterizes as dangerous topographical conditions, specifically vegetation growth, on their property.

[¶2]    Bell argues that the Superior Court erred when it determined, with respect to the negligent supervision claim, that the Dawsons owed no duty of care to Timothy because Timothy was not in a custodial relationship with the Dawsons

when the accident occurred. Bell also argues that the court erred when it granted a summary judgment in favor of the Dawsons on the vegetation condition claim after determining that there was no indication that growth of trees or bushes on the Dawsons' property contributed to the accident. We affirm the judgment.

## I. CASE HISTORY

[¶3] The following facts, presented in a light most favorable to Bell as the nonprevailing party, are supported in the summary judgment record. *See Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 2, 45 A.3d 722.

[¶4] Timothy Bell lives with his parents, Teresa and Robert, in North Berwick. Timothy occasionally spent time at the property of Rose and Randall Dawson, also in North Berwick. On those occasions, Timothy would hang out in the Dawsons' garage with Randall and smoke cigarettes that the Dawsons gave him. The Dawsons' property is on the north side of a tree-lined street in an area where the houses are on lots of about two acres. Timothy's parents knew nothing about the Dawsons.

[¶5] On May 9, 2009, Timothy, then thirteen years old, and one or two of his friends went to hang out in the Dawsons' garage. The boys left the Dawsons' property, but Timothy and his friends returned later that evening after Randall and Rose had begun drinking. Randall invited them inside to watch television, the boys asked to spend the night at the Dawsons' home, and the Dawsons agreed.

Rose later admitted that, due to her drinking, it was not responsible of her to allow the boys to spend the night and that she was not in a position to supervise children.

[¶6]  Timothy phoned his mother, led her to believe that he was at a particular friend's house, and asked to spend the night at that friend's house. Minutes later, Rose phoned Teresa, falsely claiming to be the friend's mother. Teresa agreed to the overnight, not realizing that Timothy was actually spending the night at the Dawsons' home.  Rose and Randall went to bed at 10:30 p.m.; they did not know what the boys did while the two of them slept.  According to one of the boys, Timothy left the Dawsons' home at approximately 1:00 a.m. and did not return until 3:00 or 4:00 a.m.

[¶7]  Timothy left the Dawsons' property the following morning and went home.  He arrived at his parents' home at approximately 7:00 a.m. and stayed for twenty minutes.  He talked with his parents during that time, and his mother believed that he was tired.  His mother has stated that Timothy is more prone to getting hurt when he does not get enough sleep.  However, Timothy's parents did not object when Timothy left their home with his skateboard stating that he was going to go find his friend.

[¶8]  The record does not indicate whether Timothy went directly to the Dawsons', but at some point that morning Timothy returned to the Dawsons' property.  Timothy rode his skateboard down the Dawsons' driveway and was

struck by a motorist in the roadway as the motorist headed west on the Dawsons' street. Timothy sustained serious injuries. He does not remember anything about the accident. Timothy's mother had instructed him on the rules of the road, and he knew that he was not to skateboard in front of moving vehicles. His mother asserts that Timothy's judgment was impaired on the day of the accident because he was tired from his unsupervised activities the previous night.

[¶9] There is no genuine dispute that Randall saw Timothy leave the Dawsons' property on the morning of May 10, 2009, before the accident occurred. There are discrepancies as to when he saw Timothy leave, however. The record establishes that Randall saw Timothy walk down the driveway with his skateboard tucked under his arm, hop on the skateboard, and "head[] toward town" sometime early in the morning. Randall estimated that Timothy left the property at around 7:00 a.m., which is generally consistent with when Timothy arrived at his parents' home. However, Randall also recollected that the accident occurred thirty to forty-five minutes after Timothy left the property. Bell denied that the accident occurred thirty to forty-five minutes later, citing evidence in the record that the accident occurred between 10:30 and 10:45 a.m.

[¶10] Viewing the record most favorably to Bell, the summary judgment record arguably could support a finding, assuming the accident did occur thirty to forty-five minutes after Randall saw Timothy leave the property, that Randall

actually saw Timothy leave his property at around 10:00 a.m. As discussed below, however, to the extent the record generates a genuine dispute as to when Randall saw Timothy leave the property, that fact is not material to the outcome. There is no indication in the record that Rose or Randall knew that Timothy had returned to their property after Randall saw him leave, whatever time that was, and they did not witness the accident. In fact, Rose was still asleep when the accident occurred.

[¶11] The motorist never saw Timothy until after she felt an impact, stopped, and exited her vehicle. The motorist later speculated that, if Timothy came from the Dawsons' driveway, and if anything prevented her from seeing him, it would have been trees, but she could not say that trees obstructed her view.

[¶12] Randall purchased the Dawson property in 1977, and Rose moved there in 1984. In 1984, there was a crabapple tree on the east side of the Dawsons' driveway, and that tree, along with a utility pole that appears to be closer than the tree to the street, was present at the time of Timothy's accident. The tree's base was approximately ten feet north of the road in a town right-of-way. The record shows that foliage extends into the Dawsons' property but does not extend into the roadway or obscure the view of the base of the Dawsons' driveway. Rose has cut off branches lower than five and one-half feet, but does not otherwise trim the crabapple tree.

[¶13]  Rose has also planted some bushes to the east of the driveway, most notably a forsythia bush on the property approximately fifteen feet north of the street.  Rose trims the forsythia bush each spring mainly because she prefers to keep it neatly trimmed and also to allow a clearer view of the driveway which she agreed was "safer."  Rose had not trimmed the bush before the accident, and the bush was approximately three feet high at the time of the accident.

[¶14]  Bell filed a complaint against the Dawsons alleging, as amended, negligent supervision and that the Dawsons negligently "created or allowed dangerous topographical conditions contributing to the accident."  The Dawsons moved for summary judgment on both counts of the amended complaint.  After a hearing, the court granted a summary judgment to the Dawsons on both counts of the complaint.  Bell filed this timely appeal.

## II.  LEGAL ANALYSIS

[¶15]  We review the grant of a summary judgment de novo, viewing the evidence, and the reasonable inferences that may be drawn therefrom, in the light most favorable to the nonmoving party.  *Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 2011 ME 11, ¶ 15, 11 A.3d 308.  "Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Id.*  An issue is genuine if the party opposing summary judgment presents sufficient evidence to require a fact-finder to choose

between competing versions of the truth at trial. *Rainey v. Langen*, 2010 ME 56, ¶ 23, 998 A.2d 342; *Doe I v. Williams*, 2013 ME 24, ¶ 76, 61 A.3d 718.

[¶16] "To survive a defendant's motion for a summary judgment, the plaintiff must establish a prima facie case for each element of her cause of action." *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346. "[T]he evidence [of factual elements] must be sufficient to allow a fact-finder to make a factual determination without speculating." *Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 19, 60 A.3d 759. We will affirm the grant of a summary judgment against a plaintiff who presents insufficient evidence to support an essential element in her cause of action, such that the defendant would be entitled to judgment as a matter of law on that state of the evidence at a trial. *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 11 n.5, 66 A.3d 7.

[¶17] "A cause of action for negligence has four elements: (1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury." *Estate of Smith*, 2013 ME 13, ¶ 16, 60 A.3d 759. "Duty" in this case refers to whether the Dawsons were "under any obligation for the benefit of" Timothy. *Gniadek*, 2011 ME 11, ¶ 17, 11 A.3d 308. We address Bell's two negligence claims in turn.

A.    Negligent Supervision Claim

[¶18]  Bell argues that the court erred in concluding, as a matter of law, that the Dawsons' custodial relationship with, and therefore duty of care toward, Timothy ended when he left their property and returned to his parents' home in the morning.   Bell asserts that a jury could find that the Dawsons' custodial relationship continued to the time of the accident.

[¶19]  The tort of negligent supervision first requires that the defendant owe a duty of supervision to the plaintiff.  That duty arises from a special relationship, such as a custodial relationship, between the parties.  *Id.* ¶¶ 17-18, 24-25.  "A custodial relationship exists between 'those who are required by law to take physical custody of another or who voluntarily do so, such as to deprive the other of his normal opportunities for protection.'"  *Id.* ¶ 24 (quoting *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶ 18, 970 A.2d 310 (quoting Restatement (Second) of Torts § 314A (1965))).  The existence of a duty is a question of law, as is the scope of that duty.  *Id.* ¶ 17.

[¶20]  The record shows that, on the evening of May 9, 2009, the Dawsons created a custodial relationship with Timothy and assumed a duty to him that could give rise to a claim of negligent supervision.  *See id.* ¶¶ 17, 24-25.  However, the scope of a duty "arising from a custodial relationship is circumscribed by temporal and geographic limitations."  *Id.* ¶ 25.  Thus, a duty "exists only where the special

relationship is intact and the risk of harm, or [of] further harm, arises in the course of that relation." *Id.* (citing Restatement (Second) of Torts § 314A cmt. c (1965)). For example, we have held that, to the extent that a summer camp had had a custodial relationship with a camper, it did not have a custodial relationship, and therefore no duty, to the camper two months after camp ended. *See Gniadek*, 2011 ME 11, ¶¶ 26-27, 11 A.3d 308. Similarly,

> [a] carrier is under no duty to one who has left the vehicle and ceased to be a passenger, nor is an innkeeper under a duty to a guest who is injured or endangered while he is away from the premises. Nor is a possessor of land under any such duty to one who has ceased to be an invitee.

*Id.* ¶ 25 (quoting Restatement (Second) of Torts § 314A cmt. c) (citing *Mastriano v. Blyer*, 2001 ME 134, ¶ 17, 779 A.2d 951 (explaining that a cab driver had no duty to affirmatively protect an intoxicated passenger from the passenger's own actions after the passenger made a safe exit in a safe place)).

[¶21]  The custodial relationship that was formed when Timothy and the Dawsons deceived Timothy's parents into letting him stay overnight at the Dawsons' house was severed when Timothy left the Dawsons' home, returned to his parents' home, and reestablished his opportunity for protection and supervision by his parents. The Dawsons did not create a new custodial relationship with Timothy on the morning of the accident. There is no evidence, direct or circumstantial, that the Dawsons assumed custody of Timothy after he left the

Dawsons' property to return to his parents' home at 7:00 a.m. or that they deprived Timothy of his normal opportunities for parental protection at that point. Rather, the record shows that Timothy returned to his home, interacted with his parents, and his parents made the choice to allow him to leave with his skateboard without adult supervision.[1]

[¶22] Bell nonetheless argues that, even if the Dawsons did not have a custodial relationship with Timothy at the time of the accident, the court erred in granting a summary judgment because a fact-finder could have found that the Dawsons' negligent supervision of Timothy during the night when the custodial relationship was intact created the risk of harm—that is, Timothy's fatigue—that proximately caused Timothy's injuries the next morning.

[¶23] Bell's theory of the scope of one's duty during the night ultimately turns on whether, as a matter of law, an adult supervising a teenage sleepover has a duty to (1) ensure that a child actually obtains sufficient sleep, whatever that may mean, throughout the night, or (2) know exactly how much sleep a child did get so that the adult can assess whether it was enough for that particular child to engage

---

[1] Thus, it is ultimately immaterial whether Randall saw Timothy leave the Dawsons' property with his skateboard at 7:00 a.m. as Timothy was leaving to go home, or saw Timothy leave later in the morning after Timothy had gone home. The Dawsons' custodial relationship with Timothy was severed when he returned home, and even if the record could support a finding that Randall saw him later in the morning, that is insufficient as a matter of law to have reestablished the Dawsons' voluntary taking of physical custody of Timothy or their depriving Timothy of his normal opportunities for protection before the accident occurred. *See Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 2011 ME 11, ¶ 24, 11 A.3d 308.

in some future activity, even one that occurs after the child has left that adult's custody.[2] We decline to impose such a duty to monitor sleep patterns at a teenage sleepover.

[¶24] Further, Bell has presented insufficient evidence to establish a prima facie showing of causation. *See Trott*, 2013 ME 33, ¶ 11 n.5, 66 A.3d 7; *Bonin*, 2005 ME 59, ¶ 8, 873 A.2d 346. There is no evidence, for example, showing how much sleep Timothy had that night; that Timothy would have slept more even if he had been adequately supervised; that, regardless of how he appeared to his mother, he was actually fatigued at the time of the accident; or that, if he was fatigued, that fatigue was a substantial factor in bringing about this accident. *See McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 8, 43 A.3d 948 (discussing the element of proximate cause). Any finding that Timothy was fatigued due to the Dawsons' failure to adequately supervise him during the sleepover and that any such fatigue was the proximate cause of the accident would be, on this record, pure speculation. *See Estate of Smith*, 2013 ME 13, ¶ 19, 60 A.3d 759; *McIlroy*, 2012 ME 59, ¶ 8, 43 A.3d 948.

[¶25] The manner in which the Dawsons conducted themselves on the evening of May 9, 2009, and the extremely poor judgment they demonstrated

---

[2] The Dawsons' failure to remain sober while caring for the boys and to ensure that Timothy remained safely in their home through the night may well constitute breaches of their duty to supervise, but the crux of Timothy's contention is that his fatigue caused by lack of sleep—whatever the reason for that lack of sleep—led to his poor judgment in skateboarding in front of a moving vehicle the following day.

throughout their interactions with Timothy, is unconscionable. However, the court did not err as a matter of law in granting a summary judgment in favor of the Dawsons on Bell's claim of negligent supervision. *See Trott*, 2013 ME 33, ¶ 11 n.5, 66 A.3d 7; *see also Gniadek*, 2011 ME 11, ¶ 27, 11 A.3d 308.

B.     Negligently Creating or Allowing Dangerous Topographical Conditions

[¶26]  Bell argues that the court erred in granting a summary judgment on the second count of the amended complaint because there is a genuine issue of material fact relating to whether the untrimmed bushes, which Bell argues are "artificial conditions," to the east of the Dawsons' driveway, prevented proper visibility from the street to the driveway, thereby proximately causing Timothy to be hit by an oncoming car after he exited the driveway. Bell also argues that the Dawsons had a duty to protect those off their premises from dangerous conditions caused by the untrimmed bushes on their premises.

[¶27]  The trial court granted summary judgment because it concluded that Bell did not establish the element of causation. However, we may consider the issue of duty. *See Fuhrmann v. Staples the Office Superstore E., Inc.*, 2012 ME 135, ¶ 15 n.3, 58 A.3d 1083 (stating that we may affirm a grant of summary judgment on an alternate ground argued by the moving party).

[¶28]  Because there is no genuine dispute that Timothy's injuries occurred off the Dawsons' premises, "laws relating to" the Dawsons' "duty of care to those

on [their] property are not applicable." *Radley v. Fish*, 2004 ME 87, ¶ 8, 856 A.2d 1196. The issue is whether the Dawsons had a duty to Timothy, after he left their premises, to have provided an unobstructed view of the driveway on their premises from the roadway.[3]

[¶29] We held in *Radley*, a case in some ways factually similar to this, that a landowner does not owe a duty to protect off-premises travelers on an adjacent roadway with respect to natural conditions on the landowner's premises.[4] *Id.* ¶¶ 9-12. However, we observed that a landowner could have a duty to those outside of his property with respect to dangerous, artificial conditions on the landowner's property. *Id.* ¶ 10 (citing Restatement (Second) of Torts § 364 (1965)). Nonetheless, such a duty arises only if the landowner "realizes or should realize" that the condition "will involve an unreasonable risk of harm." *Id.* ¶ 10 n.4 (quoting Restatement (Second) of Torts § 364); *Parrish v. Wright*, 2003 ME 90, ¶ 20, 828 A.2d 778.

---

[3] Bell has developed no argument that the untrimmed vegetation obstructed Timothy's view of the road, but rather, argues that the untrimmed vegetation prevented travelers in the road from seeing into the driveway.

[4] In *Radley*, a car struck a child on a bike on a roadway after the child left a landowner's driveway, where overgrown weeds "along the end of the driveway" purportedly obstructed the view of the child from the road. *Radley v. Fish*, 2004 ME 87, ¶¶ 2, 7, 9 & n.3, 11, 856 A.2d 1196. The child's parents argued, in part, that the landowner owed the child a duty to protect him from off-premises injury caused by conditions on the property by trimming the weeds along the end of the landowner's driveway. *Id.* ¶¶ 5, 9.

14

[¶30]  In *Radley*, we declined to impose on a landowner a duty to trim overgrown weeds—deemed to be a natural condition—along the end of his driveway or risk liability for off-premises accidents.  *Radley*, 2004 ME 87, ¶¶ 11-12, 856 A.2d 1196.  Here, Bell urges us to hold that any vegetation that was either planted by a person or has been changed in any way by a person is an "artificial condition" and to impose a duty on landowners to trim artificial conditions on their property.[5]  *See generally* Restatement (Second) of Torts § 363 cmt. b (1965).  On this record, however, we need not address whether the vegetation at issue could be found to be "artificial" and what ramifications such a ruling might have in a largely rural, heavily wooded state.

[¶31]  Even if deemed an "artificial condition," to give rise to any duty, the vegetation at issue must have posed "an unreasonable risk of harm," in the circumstances.  *See Radley*, 2004 ME 87, ¶ 10 & n.4, 856 A.2d 1196; *Parrish*, 2003 ME 90, ¶ 20, 828 A.2d 778.  "[T]he determination of the scope of a defendant's duty rests not only on foreseeability, but also other policy considerations."  *Radley*, 2004 ME 87, ¶ 11, 856 A.2d 1196 (declining to create a duty on the landowner, based on a foreseeable risk of harm to users of the adjacent way, to trim weeds along the end of his driveway "or run the risk of the kind of

---

[5]  Alternatively, Bell urges us to hold landowners potentially liable for any dangerous condition on their land, whether natural or artificial.  To the extent that Bell is urging us to overrule *Radley*, 2004 ME 87, 856 A.2d 1196, we decline to do so.

liability that the [plaintiffs] seek to impose," noting that "[t]he consequences of imposing such a legal duty on a landowner to control natural conditions on the landowner's property for the benefit of those off the property are too severe"). Maine is a largely rural state. Vegetation, in varying stages of growth and with foliage that changes with the seasons, exists at or near the intersection of many roadways and driveways. Although not apparently at issue in this case, some vegetation on private property may be planted or maintained with a purpose to limit the view into private property of persons driving or walking on the roadway. We decline on the facts of this case to impose a duty on landowners to trim back vegetation on their premises that may be alleged to be in the vicinity of the intersection of roadways and driveways or walkways.[6]

[¶32] The court did not err in granting a summary judgment in favor of the Dawsons on the second count of Bell's amended complaint.[7]

The entry is:

Judgment affirmed.

---

[6] We also note that the most significant view obstruction in the vicinity of the intersection of the roadway and the driveway in this case may have been the utility pole over which the Dawsons exercised no control.

[7] This case is readily distinguishable from our decision in *McIlroy v. Gibson's Apple Orchard* in which we held that a material issue of fact existed as to whether a sign placed by the orchard at an intersection was a proximate cause of an accident, precluding entry of a summary judgment. 2012 ME 59, ¶¶ 1, 9, 43 A.3d 948.

**On the briefs:**

Sheldon J. Tepler, Esq., Hardy, Wolf & Downing, P.A., Lewiston, for appellant Teresa Bell

Jonathan W. Brogan, Esq., and Kristina M. Balbo, Esq., Norman, Hanson & DeTroy, LLC, Portland, for appellees Randall and Rose Dawson

**At oral argument:**

Sheldon J. Tepler, Esq., for appellant Teresa Bell

Jonathan W. Brogan, Esq., for appellees Randall and Rose Dawson

York County Superior Court docket number CV-2012-53
FOR CLERK REFERENCE ONLY