MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:        2024 ME 27
Docket:          Cum-23-249
Argued:          February 7, 2024
Decided:         April 18, 2024

Panel:           STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

TIFFANY VARGAS et al.

v.

RIVERBEND MANAGEMENT LLC

HORTON, J.

[¶1]  We are called to consider the standard governing an employer's vicarious liability under the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551-4634 (2023), for an employee's discriminatory behavior toward a customer.  Tiffany Vargas and Erika Acevedo appeal from a judgment entered after a bench trial in favor of Riverbend Management, LLC, by the Superior Court (Cumberland County, *McKeon, J.*) on their claims of race discrimination in violation of the MHRA.  After making findings of fact orally on the record at the close of trial, the court concluded that Riverbend was not vicariously liable for a racial slur directed at Vargas and Acevedo by one of Riverbend's employees while the employee was working at Riverbend's premises.  In light of the court's

2

findings, the record evidence, and the factors relevant to vicarious liability, we affirm the judgment.

## I. BACKGROUND

### A. Facts

[¶2]  The following summary is based on the court's express findings, all of which are supported by the record.  *See Hum. Rts. Def. Ctr. v. Me. Cnty. Cmm'rs Ass'n Self-Funded Risk Mgmt. Pool*, 2023 ME 56, ¶ 3, 301 A.3d 782.

[¶3]  Vargas's ethnicity is African-American, Native-American, and Portuguese, and Acevedo is a Dominican-born Latina.  Vargas has experienced racism growing up in Maine.

[¶4]  On August 16, 2020, Vargas and Acevedo stopped for a cup of iced coffee at a McDonald's restaurant located on Forest Avenue in Portland.  The Forest Avenue McDonald's restaurant is owned and operated by Riverbend Management Company, LLC.  Scott Lydick is the sole member of Riverbend and is involved in the management and operation of the restaurant.

[¶5]  There are three stations at the McDonald's drive-through: the unstaffed station where customers speak into a microphone and deliver their orders, the staffed "pay window" where customers pay, and the staffed "present window" where an employee hands customers their purchases.

[¶6]  Vargas and Acevedo placed their order at the first station, paid at the second station, and proceeded to the present window, where a Riverbend employee named Andrew Mosley handed the iced coffee to Vargas.  Vargas asked him for a cup of ice.  Mosley informed her that, to get the cup of ice, they would have to go through the drive-through again.  This irritated Vargas.  Vargas asked Mosley for his name and he said, "Bubba."  Mosley closed the window and left.  Vargas waved to another Riverbend employee, Mohammed Muhee, who came to the window.  After Vargas reiterated her request, Muhee gave her a cup of ice and said something along the lines of, "Don't mind him, he's this way sometimes."  Vargas asked Muhee for Mosley's name, and Muhee told her that his name was Andrew.

[¶7]  After Vargas and Acevedo drove away from the window, they saw Mosley delivering food to another car in the parking lot.  As Mosley walked back to the McDonald's building, Vargas called out to him something like "Good day, Andrew" or "Have a nice day, Andrew."  Mosley responded by angrily cursing at her and Acevedo and delivering a profoundly offensive racial slur.[1]

[¶8]  On the next day, August 17, 2020, Vargas made a complaint about Mosley to the national corporate office of McDonald's, which promptly notified

---

[1] Vargas and Acevedo testified that Mosley screamed at them, "F*** you, n*****s."

4

Riverbend. Lydick immediately forwarded the complaint to the restaurant manager, Faye Welsh, requesting that she investigate Vargas's complaint. Welsh interviewed Mosley, who gave a different version of what occurred. Lydick directed Welsh to terminate Mosley's employment. Lydick also reached out to Vargas twice by email and at least once by phone.

## B. Procedure

[¶9] Vargas and Acevedo initially filed a complaint with the Maine Human Rights Commission, which issued a right-to-sue letter entitling them to commence an action in the Superior Court for damages and attorney fees. 5 M.R.S. §§ 4612(6), 4621, 4622(1)(C). On December 2, 2021, Vargas and Acevedo filed a complaint in the Superior Court against Riverbend alleging race and gender discrimination under the Maine Human Rights Act (MHRA). *See* 5 M.R.S. §§ 4551-4634. On January 31, 2022, Riverbend filed an answer containing affirmative defenses, denying any violation of the MHRA.

[¶10] On December 2, 2022, Riverbend filed a motion for summary judgment along with six exhibits. The motion asserted that Riverbend is not vicariously liable for the race discrimination committed by its employee and that Vargas and Acevedo had not asserted a valid gender discrimination claim. In opposing the motion, Vargas and Acevedo contended that Riverbend is

vicariously liable for the actions of its employee because Mosley was acting in the scope of employment when he made the discriminatory comment.

[¶11] On March 21, 2023, the court entered an order on Riverbend's motions for summary judgment. The court partially granted the motion for summary judgment, entering judgment in favor of Riverbend on the gender discrimination claim because Vargas and Acevedo had not raised a gender discrimination claim before the Commission and therefore could not seek damages or attorney fees. 5 M.R.S. § 4622(1)(C). The court denied summary judgment on the race-discrimination claim.

[¶12] The court held a bench trial on May 11 and 15, 2023. The court heard testimony from Vargas, Acevedo, Muhee, Lydick, and Welsh. The court made oral findings following trial, finding for Riverbend. The court determined that Mosley violated the MHRA when he used a racial slur against Vargas and Acevedo but concluded that Riverbend was not vicariously liable for Mosley's actions.

[¶13] On May 25, 2023, Vargas and Acevedo filed a motion to alter or amend the judgment, and Riverbend opposed it. M.R. Civ. P. 59(e). On July 3, 2023, the court denied the motion. Relying on both the Restatement (Second) of Agency (Am. L. Inst. 1958) and the Restatement (Third) of Agency

6

(Am. L. Inst. 2006), the court noted that the result "would be the same under either" and that Riverbend was not vicariously liable because Mosley's conduct was "not actuated by a purpose to serve the [employer]."[2]

[¶14]    Vargas and Acevedo filed a timely appeal.[3]    *See* M.R. App. P. 2B(c)(1); 14 M.R.S. § 1851 (2023).

## II. DISCUSSION

### A.    Standard of Review

[¶15]  Whether an employer can be held vicariously liable for the conduct of an employee toward a third party involves the application of law to facts. "We review the court's factual findings for clear error and its legal conclusions de novo."  *Lyman v. Huber*, 2010 ME 139, ¶ 19 n.2, 10 A.3d 707; *see Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, ¶ 12, 86 A.3d 52 ("We review the court's interpretation and application of the MHRA de novo").  Here, the court expressed some findings of fact orally on the record, but we may infer additional facts essential to the court's ruling.  *See Lyman*, 2010 ME 139, ¶ 19 n.2, 10 A.3d 707 ("In the absence of a motion for additional findings of fact, we

---

[2] The Second Restatement uses the terms "master" and "servant," whereas the Third Restatement uses the more contemporary terms "employer" and "employee."  For consistency here and below, we have substituted the Third Restatement's terminology for that of the Second Restatement.

[3] In addition to the parties' briefs, we received an amicus curiae brief from the Maine Employment Lawyers Association.

will infer that the court found all the facts necessary to support its decision, and we will inquire whether such inferred findings are supported by the record.").

## B. The MHRA's Prohibition on Discrimination in Public Accommodations

[¶16] The MHRA prohibits discrimination in employment, housing, credit extension, education, and places of public accommodation based on race, color, sex, sexual orientation or gender identity, physical or mental disability, religion, ancestry or national origin, age, and familial status. *See* 5 M.R.S. § 4552. "The opportunity for every individual to have equal access to places of public accommodation without discrimination because of race, color, . . . or national origin is recognized as and declared to be a civil right." 5 M.R.S. § 4591. A "place of public accommodation" is "a facility, operated by a public entity or private entity, whose operations fall within" a number of categories, including "a restaurant, eating house, . . . or other establishment serving or selling food or drink."[4] 5 M.R.S. § 4553(8)(B).

[¶17] The MHRA prohibition against discrimination at places of public accommodation is sweeping:

> It is unlawful public accommodations discrimination, in violation of this Act[,] . . . [f]or any public accommodation or any person who is the owner, lessor, lessee, proprietor, operator, manager, superintendent,

---

[4] That the McDonald's is a place of public accommodation is not disputed by the parties. *See* 5 M.R.S. § 4553(8)(B) (2023).

8

agent or employee of any place of public accommodation to directly or indirectly refuse, discriminate against or in any manner withhold from or deny the full and equal enjoyment to any person, on account of race or color, sex, sexual orientation or gender identity, age, physical or mental disability, religion, ancestry or national origin, any of the accommodations, advantages, facilities, goods, services or privileges of public accommodation, or in any manner discriminate against any person in the price, terms or conditions upon which access to accommodations, advantages, facilities, goods, services and privileges may depend.[5]

5 M.R.S. § 4592(1); *see Me. Hum. Rts. Comm'n v. Le Club Calumet*, 609 A.2d 285, 286-87 (Me. 1992) (defining the elements of a claim of discrimination at a place of public accommodation).

---

[5] "We have acknowledged differences between the MHRA and federal anti-discrimination laws." *Smith v. City of Sanford*, 2023 ME 48, ¶ 15 n.3, 300 A.3d 841. In some instances, we have relied on the federal anti-discrimination cases to help interpret the MHRA. *See Doyle v. Dep't of Hum. Servs.*, 2003 ME 61, ¶ 14 n.7, 824 A.2d 48; *Me. Hum. Rts. Comm'n v. City of Auburn*, 408 A.2d 1253, 1261 (Me. 1979).

The federal statute provides, "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C.A. § 2000a(a) (Westlaw through Pub. L. No. 118-41). To prove a claim under the public-accommodations law, the statute requires a showing of discrimination with respect to specific activities, such as the right to contract. *See* 42 U.S.C.A. § 1981 (Westlaw through Pub. L. No. 118-39); *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003) ("Section 1981 does not provide a general cause of action for race discrimination"); *see also Garrett v. Tandy Corp.*, No. Civ. 00-384-P-H, 2003 WL 21250679, at *7-8 (D. Me. May 30, 2003); *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001).

The Maine statute is broader; Maine's public-accommodation law prohibits discrimination regarding equal access to a public accommodation; a person must not deny or refuse access to use of the public accommodation or discriminate against a person attempting to enjoy the public accommodation. *Compare* 42 U.S.C.A. § 2000a(a) (Westlaw through Pub. L. No. 118-41), *with* 5 M.R.S. §§ 4591-92 (2023); *see* Stuart W. Tisdale, Jr., *Reasonable Accommodation and Non-Invidious Discrimination Under the Maine Human Rights Act*, 40 Me. L. Rev. 475, 495-502 (1988).

[¶18]  Riverbend has not disputed that Mosley's use of a racial slur toward Vargas and Acevedo after they had purchased food constituted discrimination on account of race at a place of public accommodation in violation of MHRA.  The sole question presented to us is whether the trial court should have held Riverbend vicariously liable for Mosley's actions.

## C. The Framework for Determining an Employer's Vicarious Liability Under MHRA for an Employee's Act of Discrimination Against a Customer

[¶19]  The MHRA expressly incorporates principles of vicarious liability by defining the term "employer" to include "any person acting in the interest of any employer, directly or indirectly, such that the person's actions are considered the actions of the employer for purposes of liability."  5 M.R.S. § 4553(4); *see Fuhrmann v. Staples Off. Superstore E., Inc.*, 2012 ME 135, ¶ 34, 58 A.3d 1083.  The MHRA does not provide any test or standard for determining whether a person is "acting in the interest" of an employer for purposes of vicarious liability but provides,

> In determining whether a person is acting as an agent or employee of another person so as to make such other person responsible for that person's acts, the question of whether the specific acts performed were actually authorized or subsequently ratified is not controlling.

5 M.R.S. § 4553(10)(E).[6]

[¶20]  In addressing whether an employer is vicariously liable for actions of an employee, we have regularly relied on the formulations contained in the Restatement (Third) of Agency and the Restatement (Second) of Agency.  *See, e.g.*, *Canney v. Strathglass Holdings, LLC*, 2017 ME 64, ¶ 12, 159 A.3d 330 (citing Third Restatement); *Fuhrmann*, 2012 ME 135, ¶ 33, 58 A.3d 1083 (citing Third Restatement); *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶ 12, 970 A.2d 310 (citing Second Restatement); *Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 2011 ME 11, ¶¶ 33-36, 11 A.3d 308 (citing the Second and Third Restatement); *Mahar v. StoneWood Transp.*, 2003 ME 63, ¶ 13, 823 A.2d 540 (citing Second Restatement).  Accordingly, the parties and the court applied principles of vicarious liability as codified in the Restatement in addressing the question of Riverbend's vicarious liability for Mosley's conduct.  The parties disagree on which edition of the Restatement to apply in determining whether Mosley's conduct was within the scope of his employment for purposes of determining whether Riverbend is vicariously liable.

---

[6]  Because authorization and ratification are among the common law criteria for imposing vicarious liability upon a principal for the acts or omissions of an agent, *see Bonk v. McPherson*, 605 A.2d 74, 78-79 (Me. 1992), the MHRA implicitly contemplates that the question of an employer's vicarious liability for the conduct of an employee or other agent will be decided based on common law principles regarding agency.

[¶21]  Riverbend's argument against vicarious liability focuses on section 228 of the Second Restatement, which provides:

> (1) Conduct of a[n] [employee] is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> > (b) it occurs substantially within the authorized time and space limits;
> > (c) it is actuated, at least in part, by a purpose to serve the [employer], and
> > (d) if force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer].
>
> (2) Conduct of a[n] [employee] is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the [employer].

Restatement (Second) of Agency § 228.

[¶22] Section 228 works in tandem with section 229, which identifies factors relevant to the question whether an employee's conduct is within the scope of employment for purposes of vicarious liability:

> (1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
>
> (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such [employees];

(b) the time, place and purpose of the act;

(c) the previous relations between the [employer] and the [employee]

(d) the extent to which the business of the [employer] is apportioned between different [employees];

(e) whether or not the act is outside the enterprise of the [employer] or, if within the enterprise, has not been entrusted to any [employee];

(f) whether or not the [employer] has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the [employer] to the [employee];

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

Restatement (Second) of Agency § 229.

[¶23] Vargas and Acevedo rely instead on the counterpart to section 228 in the Third Restatement, which provides:

(1) An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.

(2) An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

(3) For purposes of this section,

(a) an employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work, and

(b) the fact that work is performed gratuitously does not relieve a principal of liability.

Restatement (Third) of Agency § 7.07.

[¶24] As a general matter, "the principles set out in the Third Restatement largely mirror the principles set out in the Second Restatement." *Hedgeye Risk Mgmt., LLC v. Heldman*, 412 F. Supp. 3d 15, 26 n.3 (D.D.C. 2019). Section 7.07 of the Third Restatement resembles sections 228 and 229 of the Second Restatement but the provisions of the two Restatements are not identical. One difference is that section 7.07 diminishes the significance of whether the employee's conduct at issue occurs during working hours and at the workplace:

The formulation of the scope-of-employment doctrine in [section 7.07(2)] differs from its counterparts in Restatement Second, Agency §§ 228 and 229 because it is phrased in more general terms. Under Restatement Second, Agency § 228(1)(b), conduct falls within the scope of employment when it "occurs substantially within the authorized time and space limits." This formulation does not naturally encompass the working circumstances of many managerial and professional employees and others whose work is not so readily cabined by temporal or spatial limitations. Many employees in contemporary workforces interact on an employer's behalf with third parties although the employee is neither situated on the employer's premises nor continuously or exclusively engaged in performing assigned work.

Restatement (Third) Of Agency § 7.07 cmt. b.

[¶25] Another difference between the formulations is that the Third Restatement adopts a somewhat more concrete test for whether employee conduct is within the scope of employment. *Compare* Restatement (Third) Of Agency § 7.07(2) ("An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control"), *with* Restatement (Second) of Agency § 229(1) ("To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.").

[¶26] The trial court considered both section 228 of the Second Restatement and section 7.07 of the Third Restatement and concluded that the vicarious liability analysis under each is "largely the same." Indeed, the result under both versions hinges on the extent to which the employee conduct at issue involves work assigned to the employee and is intended to serve the interests of the employer. Both versions apply the MHRA vicarious-liability standard by putting the focus on whether the employee is "acting in the interest of [the] employer, directly or indirectly, such that the person's actions are considered the actions of the employer for purposes of liability." 5 M.R.S.

§ 4553(4). For clarity and in light of the overarching remedial purpose of the MHRA, we base our analysis on the more contemporary and more "general" standard of the Third Restatement.[7]

[¶27] The Third Restatement test raises two broad questions about employee conduct that is the basis for a claim that the employer is vicariously liable. The questions are,

> 1. Does the employee conduct at issue consist of "performing work assigned by the employer or engaging in a course of conduct subject to the employer's control"?
>
> 2. Does the employee conduct at issue consist of "an independent course of conduct not intended by the employee to serve any purpose of the employer"?

*See* Restatement (Third) Of Agency § 7.07(2).

[¶28] If the employee's conduct does not involve performing work or some other activity subject to the employer's control, it is not within the scope of employment and cannot support a vicarious-liability claim. As a comment to section 7.07 makes clear, "[a]n employee's conduct is within the scope of employment when it constitutes performance of work assigned to the

---

[7] We do not necessarily abandon or disclaim reliance on the Second Restatement, particularly in the context of vicarious-liability claims based on an employer's or agent's negligence and other unintentional torts. For example, the factors enumerated in section 229 of the Second Restatement are more relevant to such claims than to MHRA claims. Restatement (Second) of Agency § 229 (Am. L. Inst. 1958).

employee by the employer. The fact that the employee performs the work carelessly does not take the employee's conduct outside the scope of employment, nor does the fact that the employee otherwise makes a mistake in performing the work. Likewise, conduct is not outside the scope of employment merely because an employee disregards the employer's instructions." Restatement (Third) Of Agency § 7.07 cmt. c.

[¶29] On the other hand, "[t]hat a remark occurred at work is thus one factor in a scope of employment analysis, but it is not without more sufficient to impute vicarious liability." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 144, 146 (4th Cir. 2018)*.* The "independent course of conduct" provision in section 7.07 applies when the employee conduct at issue is such that its purpose cannot have been to serve the employer and therefore cannot be considered to be within the scope of employment. "[T]he character, extreme nature, or other circumstances accompanying an employee's actions may demonstrate that the employee's course of conduct is independent of performing work assigned by the employer and intended solely to further the employee's own purposes." Restatement (Third) Of Agency § 7.07 cmt. c. "[An] employee's conduct is not within the scope of employment, although the employee is physically present on the employer's premises, when the

employee's actions are far removed in purpose from work assigned by the employer." Restatement (Third) Of Agency § 7.07 cmt. d. What these principles show is that, although an employee's intent to serve the employer's interests often determines whether the employer is vicariously liable, it is not dispositive if the conduct is so extreme and remote from the employer's interests that it could not reasonably have been intended to serve the employer. *See, e.g.*, *Maldonado Pinedo v. United States*, Nos. 19-4004, 19-4013, 2020 WL 2394013, at *5-11 (10th Cir. 2020); *Siemens Bldg. Techs., Inc. v. PNC Fin. Servs. Inc.*, No. 05-3646, 2007 WL 979808, at *2-4 (3d Cir. 2007). An example within the comments to section 7.07 presents such a scenario:

> P[rincipal], who employs A[gent] as a truck driver, assigns A the task of hauling a load of cargo at night on a road that runs directly from the loading to the delivery point through an isolated area with no visible sites of ongoing human activity. Soon after beginning the journey, A becomes enraged when T[hird party], driving a car immediately behind A's truck, flashes the car's high beams. A stops the truck, blocking the road, and approaches T's car, holding a length of pipe in a threatening manner. A desists when the driver behind T begins to yell at A. Under applicable law, A's conduct toward T is tortious. P is not subject to liability to T. In leaving the truck to threaten T, A embarked on a course of conduct independent of performing work assigned to A by P and motivated by A's own interests.

Restatement (Third) Of Agency § 7.07 cmt. c, illus. 8.

18

[¶30]  The example illustrates that an employee's conduct can change in a moment from being within the scope of employment to constituting "an independent course of conduct" for which the employer is not vicariously liable.[8]  The example also illustrates the point that an employee's intentional unlawful conduct is more likely than negligent conduct to be viewed as having

---

[8]  Several other illustrations in the commentary to section 7.07 present a scenario involving intentional employee conduct at a fast-food restaurant:

> 5. P[rincipal], who owns a fast-food restaurant, employs A[gent] as a junior manager. A's assigned work includes attempting to resolve complaints made by customers. T[hird party], a customer, complains to C, a cashier, when T is not served promptly. C asks for A's assistance.  A discusses T's complaint with T.  T makes profane statements to A in a loud voice.  While announcing that A will listen to T no longer, A slams A's fist into a nearby stack of plastic trays, causing the trays to scatter.  T is injured by one of the trays.  Under applicable law, A's conduct toward T is tortious.  P is subject to liability to T.  A's action in slamming the trays was incidental to performing work that P assigned to A.
>
> 6. Same facts as Illustration 5, except that T's statements to A include an accusation of misbehavior unrelated to A's work in the restaurant.  Same result. A's conduct toward T was incidental to performing work that P assigned to T.  T's introduction of an extramural grievance does not take A's conduct outside the scope of A's employment.
>
> 7. Same facts as Illustration 6, except that A follows T into the restaurant's parking lot and assaults T, stating that A cannot allow T's accusation to go unanswered.  P is not subject to liability to T.  In A's pursuit of and assault on T, A departed from A's work and engaged in an independent course of conduct not intended to further P's interests.

Restatement (Third) Of Agency § 7.07 cmt. c, illus. 5-7 (Am. L. Inst. 2006).

There are several significant differences between the facts here and the above examples—Vargas did not accuse Mosley or use profanity, Mosley did not assault Vargas, and Mosley was already in the parking lot and did not follow her.  The last example makes this a closer case than A's assault on T. On the other hand, Mosley's interaction with Vargas and Acevedo in the parking lot occurred after he and they had finished their work-related interaction, and his conduct—uttering a racial slur—was as extreme a departure from his assigned work as was A's assault on T.

a purpose "independent" of the employer's interests and therefore outside the scope of employment. As a comment to section 7.07 observes, "intentional misconduct that is distinct from an employee's actions in performing assigned work . . . is not a risk that an employer can effectively control and its occurrence may be related causally to employment no more than to other relationships and circumstances in an errant employee's life more generally." Restatement (Third) Of Agency § 7.07 cmt. b.

[¶31] The Third Restatement's focus means that, in determining issues of vicarious liability, a court must consider not just evidence of the employee's subjective intent for engaging in discriminatory conduct but also the nature of the conduct itself: whether the conduct is so extreme as to "demonstrate that [it] is independent of performing work assigned by the employer and intended solely to further the employee's own purposes." Restatement (Third) Of Agency § 7.07 cmt. c.[9] Also, because whether anything is independent of

---

[9] In its amicus brief, the Maine Employment Lawyers Association urges us not to adopt the "independent course of conduct" standard to remove an employee's discriminatory conduct from within the scope of employment for purposes of vicarious liability. The Association instead advances the stricter vicarious-liability standard that applies under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2(a)(1) (Westlaw through Pub. L. No. 118-41) and the Maine Human Rights Act in hostile-work-environment cases involving harassment of subordinate employees by supervisors, *see, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 793-803 (1998); *Johnson v. York Hosp.*, 2019 ME 176, ¶ 18, 222 A.3d 624. However, that standard stems in part from the employer's responsibility for creating the supervisor-subordinate relationship and the power imbalance that the relationship entails: "[I]t makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority . . . . [T]here is a sense in which a harassing supervisor is always assisted in his misconduct by the supervisory relationship." 524 U.S.

something else requires a comparison of the two, a court considering an issue of vicarious liability should assess not just the employee's conduct but also the employer's interests.

[¶32]   Plainly put, an employee's discriminatory conduct toward a customer is less likely to be independent of serving the employer's interests if the employer also practices (or tolerates) discrimination.  It thus becomes relevant whether the employer has adopted policies against discrimination and implemented them through training and disciplinary action, and whether the employer has tolerated discriminatory conduct by employees or repudiated it. It also is relevant whether the employer had reason to foresee that the employee in question would engage in such conduct.  *See Yucis v. Sears Outlet Stores, LLC*, No. 19-2484, 2020 U.S. App. LEXIS 17193, at *4-5 (3d Cir. 2020) (explaining that an employer's foreknowledge of an employee's motive is relevant to vicarious liability); *N.W. v. Greater Egg Harbor Reg'l High Sch. Dist.*, No. A-5079-16T4, 2018 WL 6332247, at *4 (N.J. Super. Ct. App. Div. Dec. 5, 2018) ("We decline to read [the public-accommodation statute] as imposing

---

at 802.  In essence, the Court in *Faragher* decided that workplace harassment by supervisors toward subordinates can rarely constitute an "independent course of conduct" because it is the employer's endowment of supervisory authority that enables the harassment to occur.  This case does not involve a claim of a hostile work environment.  Also, the relationship between a business's employees and its customers differs fundamentally from the supervisor-subordinate relationship in terms of power and control.  Finally, even under the *Faragher* standard, an employer is not "automatically liable" on a vicarious-liability theory, and principles of agency law apply.  *Id.* at 804.

strict or vicarious liability on an employer . . . where there is no actual or constructive notice that the employee has exhibited discriminatory conduct in the past . . . .").  As the MHRA provides, the evidence relevant to a vicarious-liability analysis thus extends well beyond the two factors articulated in the MHRA—whether the employee's discriminatory conduct at issue was "actually authorized or subsequently ratified" by the employer.  5 M.R.S. § 4553(10)(E).  Evidence of an employer's clearly articulated and vigorously enforced policy against discriminatory conduct by employees tends to refute any contention that an employee's discriminatory conduct could have reasonably been intended to serve the employer's interests.  Conversely, evidence of an employer's failure either to have a policy or to enforce a nominal policy vigorously and consistently may support a claim of vicarious liability.

## D.     The Framework Applied to this Case

[¶33]  The undisputed facts leave no doubt that Mosley was at work and subject to the employer's control when he directed the discriminatory words toward Vargas and Acevedo, but that fact is not dispositive of Riverbend's liability if his conduct was an independent course of conduct.  Here, beyond the court's express findings of fact and without a motion for additional findings of fact, the uncontroverted evidence permits us to infer additional findings

22

essential to the court's conclusion that Riverbend is not vicariously liable for Mosley's intentional and extreme discriminatory conduct:

- Riverbend has a "zero-tolerance" policy against discrimination.

- Riverbend conducts training of its employees on the zero-tolerance policy.

- There was no evidence that Riverbend has practiced discrimination or tolerated discriminatory behavior by its employees toward each other or toward customers.

- Riverbend had not received any prior complaints or other information about prior discriminatory conduct by Mosley.

- Riverbend, through its owner, Lydick, took immediate action in response to Vargas's complaint.

- Within a week of the incident, Riverbend interviewed Mosley and terminated his employment "on the spot."

- Riverbend, through Lydick, reached out to Vargas by telephone and email regarding the incident and apologized.

- Vargas and Acevedo have returned to the same McDonald's after Mosley was terminated and have not had an unpleasant experience.

The undisputed evidence supports the court's conclusion that Mosley's discriminatory act reflected an independent course of conduct "not actuated by a purpose to serve" Riverbend. We therefore affirm the court's conclusion that Riverbend is not vicariously liable for Mosley's conduct.

The entry is:

Judgment affirmed.

---

James A. Clifford, Esq. (orally), and Andrew P. Cotter, Esq., Clifford & Clifford, LLC, Portland, for appellants Tiffany Vargas and Erika Acevedo

David A. Goldman, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, for appellee Riverbend Management LLC

Peter Mancuso, Esq., and Pamela Lee, Esq., Borealis Law PLLC, Portland, for amicus curiae Maine Employment Lawyers Association

Cumberland County Superior Court docket number CV-2021-439
FOR CLERK REFERENCE ONLY