MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2025 ME 42
Docket:        Wal-24-290
Argued:        February 7, 2025
Decided:       May 13, 2025

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

CAPITAL CITY RENEWABLES, INC., et al.

v.

LILY BIRGITTA PIEL

CONNORS, J.

[¶1]  Kiril Lozanov and Capital City Renewables, Inc. (CCR) appeal from an order entered in the Superior Court (Waldo County, *R. Murray, J.*) granting Lily B. Piel's motion for summary judgment as to all causes of action in their five-count complaint.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  The following facts drawn from the summary judgment record are viewed in the light most favorable to Lozanov and CCR as the parties against whom summary judgment was entered; the facts are undisputed unless otherwise noted.  *See Dorsey v. N. Light Health*, 2022 ME 62, ¶ 2, 288 A.3d 386.

## A. Unauthorized Access to and Disclosure of Emails

[¶3]   CCR was formed as a limited liability company in 2012.   The company later reorganized as a corporation, and Lozanov acquired a controlling interest.   CCR is a wind energy business with its administrative office in Belfast and other staging locations nationwide.   The Belfast office has only one employee; the rest of CCR's employees go into the field except when training.

[¶4]   Upon the recommendation of Piel's predecessor, CCR hired Piel as an at-will employee in September 2017.   Piel's title was "project manager"; her duties included opening mail, managing basic customer communications, communicating with employees, making reservations, helping Lozanov with projects, and performing other day-to-day tasks.   Piel did not sign documentation relating to an employee handbook, and Lozanov does not recall providing her with a hard copy of a handbook.

[¶5]   Lozanov had several email accounts, including a personal account, an email account with WES Engineering (a previous employer), and a CCR email account, all linked to one email inbox so he could see all of his incoming emails in one place.

[¶6]  Piel was routinely late to work, and Lozanov informed her that she was underperforming.  Piel told Lozanov that she was having difficulty doing her work without access to Lozanov's email account, causing her to miss customer communications.  Piel requested access to the CCR email account multiple times.  Although Lozanov initially resisted, he eventually gave her access to the inbox containing all three email accounts.  Lozanov told Piel that she was not to open any non-CCR emails, which were identifiable by the receiver's email address, and that any emails she reviewed should be deemed confidential.  Piel agreed.  Lozanov stated that he did not limit Piel's access so that she had access only to the CCR email account because he did not know how to do so.  Lozanov and CCR trusted Piel to comply with his restrictions, which he repeated multiple times.  This arrangement was made orally and was intended to last indefinitely.

[¶7]  Despite the agreement, Piel accessed emails that were not related to CCR.

[¶8]  In addition to his role at CCR, Lozanov was also involved with Way Wind, LLC, through which he and other investors developed a wind project in Nebraska, hoping to sell it eventually.  The project did sell in 2018.  Piel was not involved with the Way Wind project, nor did Way Wind employ her.  Lozanov

4

signed a non-disclosure agreement with Way Wind that prohibited him from disclosing information about the project to other individuals, such as Piel, who had never signed an NDA associated with that company. Eventually, Lozanov received two payouts from the Way Wind project in mid-2018: one for $150,000 and another for $440,000. Per Lozanov's request, the $440,000 was paid to him in five checks, each sent to Belfast and each payable to him, allowing him to put them into different accounts and companies.

[¶9] Between December 2017 and June 2018, Piel became aware of the agreement to sell the Way Wind project to a third party. Piel accessed emails concerning the project, requested that she be included in the deal, and asked what she needed to do to receive a share of the profits. Lozanov reminded Piel that she had not been authorized to open or read those emails because they were not CCR-related and told Piel that she could not be added to the project or receive a share of the profits. Lozanov specifically reminded Piel that those emails were confidential and not to be shared with anyone, including his ex-wife, Sarah Lozanova.

[¶10] In January 2018, Piel moved to the neighborhood where Lozanova lived. During a conversation with Lozanova in mid-2018, Piel showed her an email and forwarded it to her. The email contained a statement expressing

excitement that they "go[t] the project" and was part of a string of emails with several recipients.  Piel shared this email because Lozanova asked for it, and Piel said that she thought she could do so because Lozanova previously worked on the Way Wind project.  After sharing the email, Lozanova told Piel, "you could get in really big trouble for this," and Piel was surprised and began experiencing anxiety about her disclosure.  The emails that Piel showed to Lozanova were not part of CCR's business; instead, they dealt with the sale of the Way Wind project.

## B.    Family Matter Proceedings

[¶11]  Lozanov and Lozanova had married in 2007 and divorced in 2016. They have two children who were twelve and fifteen at the time of Lozanov's deposition in this matter.  In July 2018, Lozanova filed a motion to modify her and Lozanov's parental rights and responsibilities, which had originally been established pursuant to an agreement between them, identifying concerns about Lozanov's parenting technique as the substantial change in circumstance warranting modification of their custody agreement.[1]  The motion to modify did

---

[1]  In response to the second question on the standard motion to modify form, Lozanova checked the box reading "Primary Physical Residence of the minor Child(ren)" and declined to check the box reading "Child Support," indicating that she filed for reasons other than a reevaluation of child support.  Question 2 recites, "Circumstances have changed substantially since the Court's Judgment and Order in this case, dated 11/18/16.  The changes concern the following issues (*Check ✓ the boxes that apply).*"  Lozanova checked the box indicating that a substantial change in circumstances justified

6

not claim a change in either party's income but did request a modification of child support based on the request for primary residence.

[¶12] In August 2018, Lozanov filed an opposition to Lozanova's motion to modify and a cross-motion to modify. In his cross-motion, Lozanov represented to the court that his income had substantially decreased and that child support should be revisited according to the guidelines. Lozanov's cross-motion to modify thus raised his change in income as an issue in the post-divorce judgment litigation.

[¶13] In December 2018, Lozanova sought financial discovery from Lozanov, including document requests and interrogatories that asked for bank statements, financial statements for his companies, and information relating to distributions from his businesses. The interrogatories asked for Lozanov's annual gross income for the last five years, his estimated gross and net income for the current year, information about his compensation, and his companies' obligations to him.

---

a change in the children's primary residence. In question four on the standard motion to modify form, she clarified the grounds for the substantial change in circumstances, stating:

> [Lozanova] is concerned about the children's quality of education and social experiences, particularly regarding the lack of educational and structured activities in which [Lozanov] will allow the children to engage. The parties disagree about the children's attendance at school versus home schooling. [Lozanova] also has concerns about the children's safety and general well-being as she understands the children are being left unsupervised for extended periods while in [Lozanov's] care.

[¶14]  Early in the summer of 2019, while in front of the courthouse, Lozanova's attorney mentioned something about Lozanov receiving a large amount of money, suggesting that Lozanova's attorney knew about the payments that Lozanov had received from the Way Wind project.

[¶15]  On June 3, 2019, Lozanov emailed Piel and wrote, "I have been in court with [Lozanova] for the past 9 months and it has been revealed that [Lozanova] has had the knowledge about me receiving the $440K from my other company."  Piel responded to the email, falsely saying that she had not provided Lozanova with the information.  Lozanov supplemented his discovery responses the same day that he sent the email and provided documents regarding the $440,000 that he had received from the Way Wind sale.

[¶16]  On March 10, 2022, the District Court entered an agreed-upon order on the competing motions to modify.  The order, through the attached child support worksheet, listed Lozanov's income as $200,000 and Lozanova's income as $75,000.  Lozanov was ordered to pay child support of $220 per week, increasing to $270 per week in January 2023.[2]  The court also ordered Lozanov to pay $22,864.16 of Lozanova's attorney fees.

---

[2] Although the original child support order is not in the summary judgment record, the parties' statements of material facts and Lozanov's deposition indicate that the court's March 2022 order increased his child support obligation and that he is claiming that increase as one aspect of the damages he seeks to recover.

[¶17] Prior to the entry of the agreed-upon order, during Lozanov's deposition, when asked if it had occurred to him that by alleging that his income was substantially reduced he might have to disclose the $440,000 payout to the court, Lozanov responded, "Oh, I haven't disclosed that to the court, and I'm aware that I am trying to hide it from the court. Not my intention. I - my intention was to avoid the court all together."

[¶18] The parties agree that during the post-judgment divorce litigation, Lozanov began experiencing health problems for which he sought medical treatment. These health problems began after Lozanov received Lozanova's discovery requests seeking financial information.

[¶19] On March 10, 2022, Lozanov and CCR filed a complaint against Piel alleging (1) intrusion upon seclusion and (2) intentional infliction of emotional distress (IIED). Piel filed a motion to dismiss the complaint in early April 2022. In October, the court granted the motion to dismiss in part and denied it in part, concluding that CCR could not establish a claim for intrusion upon seclusion because the company did not have an actionable right of privacy in Lozanov's email. The court, however, concluded that Lozanov had sufficiently alleged the elements of intrusion upon seclusion. CCR withdrew its claim for IIED, and the court then dismissed Lozanov's IIED claim, reasoning that Piel's alleged

conduct was not so outrageous as to exceed all bounds of decency and that Lozanov did not allege sufficient emotional harm. Following the court's order, Piel filed an answer to the complaint with affirmative defenses.

[¶20]  Lozanov and CCR then filed a motion to amend their complaint in March 2023, which the court granted. In the operative amended complaint, CCR and Lozanov assert five causes of action: (1) intrusion upon seclusion as to Lozanov; (2) breach of contract as to CCR; (3) conversion as to both plaintiffs; (4) trespass to chattels as to both plaintiffs; and (5) breach of fiduciary duty as to both plaintiffs.[3] Piel again answered the complaint and included affirmative defenses.

[¶21]  Lozanov sought various damages against Piel, including compensation for expenses associated with his health, such as his monthly health insurance premium and trips to Bulgaria to seek medical treatments. CCR requested compensation to recover its lost revenue due to Lozanov's health issues, which limited his ability to work at full capacity. Lozanov's and CCR's claimed damages include attorney fees, investigative expenses, accounting fees, medical expenses, counseling fees, "other financial losses," and punitive damages.

---

[3] The complaint refers to this claim as a "breach of agent's duty of loyalty," but as the allegations and the Superior Court's order accurately reflect, the claim is for a breach of fiduciary duty.

10

[¶22]  In October 2023, Piel moved for summary judgment on all counts in the complaint, arguing that her actions did not proximately cause any of the injuries or damages, that recovery was barred by public policy, and that each claim failed as a matter of law based on the undisputed material facts.  In May 2024, the Superior Court entered an order granting Piel's motion for summary judgment on all counts as to both plaintiffs.  The court entered final judgment on the same day, and Lozanov and CCR timely appealed.  *See* M.R. App. P. 2B(c)(1); 14 M.R.S. § 1851 (2024).

## II.  DISCUSSION

[¶23]  "We review the grant of a motion for summary judgment de novo, and consider both the evidence and any reasonable inferences that the evidence produces in the light most favorable to the party against whom the summary judgment has been granted in order to determine if there is a genuine issue of material fact."  *Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 12, 140 A.3d 1242 (quotation marks omitted).  "A fact is material if it has the potential to affect the outcome of the suit, and a genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive."  *Angell v. Hallee*, 2014 ME 72, ¶ 17, 92 A.3d 1154 (quotation marks omitted).  "A party's opposing

statement of material facts must explicitly admit, deny, or qualify facts by reference to each numbered paragraph, and a denial or qualification must be supported by a record citation." *Stanley v. Hancock Cnty. Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169 (quotation marks omitted). "Facts contained in a supporting or opposing statement of material facts, if supported by record citations . . . shall be deemed admitted unless properly controverted." M.R. Civ. P. 56(h)(4).

[¶24] "To survive a defendant's motion for a summary judgment, the plaintiff must establish a prima facie case for each element of her cause of action." *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346 (quotation marks omitted). This standard of preliminary production requires evidence sufficient to allow a fact-finder to make a determination without resorting to speculation. *Bell v. Dawson*, 2013 ME 108, ¶ 16, 82 A.3d 827. "If the plaintiff presents insufficient evidence on an essential element in her cause of action, such that the defendant would be entitled to judgment as a matter of law on that state of the evidence at a trial, the defendant is entitled to a summary judgment." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 12, 48 A.3d 774 (quotation marks omitted).

[¶25]  When considering the material facts, we refer to "only the portions of the record referred to, and the material facts set forth in [M.R. Civ. P. 56(h)] statements."  *Dorsey*, 2022 ME 62, ¶ 10, 288 A.3d 386 (quotation marks omitted).  We retain the discretion to "affirm a summary judgment on alternative grounds from the trial court decision when we determine, as a matter of law, that there is another valid basis for the judgment."  *Yankee Pride Transp. & Logistics, Inc. v. UIG, Inc.*, 2021 ME 65, ¶ 11, 264 A.3d 1248.

**A.     There is no evidence that Piel breached a duty owed to CCR.**

[¶26]  To establish a viable cause of action, there must be evidence of a violation of a legal duty owed by the defendant to the plaintiff, whether that duty is created by a contract between the parties or imposed in tort "by virtue of the *status* relationships of persons in society."  *McNally v. Nicholson Mfg. Co.*, 313 A.2d 913, 923 (Me. 1973); *see also Nadeau v. Fogg*, 145 Me. 10, 13, 70 A.2d 730, 732 (1950) (referencing the need in negligence claims to "establish a duty of the defendant towards the plaintiff"); *Mastriano v. Blyer*, 2001 ME 134, ¶ 12, 779 A.2d 951 ("A duty is an obligation, to which the law will give recognition and effect, to conform to a particular manner of conduct toward another.") (quotation marks omitted)); *Davis v. R C & Sons Paving, Inc.*, 2011 ME 88, ¶ 16, 26 A.3d 787 ("In contract actions, contractual recovery is predicated in the first

instance upon a consensual obligation between two or more parties.") (quotation marks and alteration omitted); *Trusiani v. Cumberland & York Distributors, Inc.*, 538 A.2d 258, 261 (Me. 1988) ("Duty involves the question of whether the defendant is under any obligation for the benefit of the particular plaintiff." (quotation marks omitted)).

[¶27]  The complaint here alleges, and the evidence reflects, misconduct *toward* Lozanov—intrusion into and disclosure of his personal emails regarding him and Way Wind.  Based on the summary judgment record, Piel's actions breached no contract *with CCR*, breached no duty that Piel owed *to CCR*, and did not trespass or convert any property owned *by CCR*.  Hence, summary judgment was properly granted as to all the claims asserted by CCR.[4]

**B.     There is no admissible evidence that Piel's conduct caused the damages claimed by CCR and Lozanov.**

**1.     CCR's claimed damages are too remote.**

[¶28]  Also, with respect to CCR, its claimed damages are too remote to support any of its alleged causes of action.  *See Stubbs v. Bartlett*, 478 A.2d 690, 693 (Me. 1984) (the causal relationship, if any, between driver's operation of a van and unrelated medical expense for pedestrian's wife was too attenuated to

---

[4]  The attenuated relationship between Piel's conduct and harm to CCR, *see infra* ¶¶ 29-31, also indicates Piel's lack of a breach of any contract with or duty owed to CCR.

warrant jury consideration as an element of pedestrian's damages based on the theory that the van lessee and driver's negligence caused the pedestrian to lose his job and his medical insurance coverage).

[¶29] The line between the element of a cause of action that a duty must exist and the element of causation, addressing whether a plaintiff's damages are too remote, can sometimes blur, and this is one of those situations. For example, in *Flynn Constr. Co. v. Poulin*, 570 A.2d 1200, 1201-02 (Me. 1990), we rejected a claim, noting that Maine has never recognized a cause of action for the loss of an employee's services from the negligent third party who caused the employee's injuries, suggesting that, here, CCR's claim fails on the duty element. Other courts have discussed this same question regarding employer claims as a causation issue.[5]

---

[5] One court summarized:

> [N]umerous courts and treatises have rejected tort claims advanced by a company-employer subsequent to an injury suffered by an employee as a result of a third-party's negligence, regardless of whether the damages sought by the company are couched as lost services of the injured employee or increased business expenses . . . *See Hartridge v. State Farm Mut. Auto. Ins. Co.*, 86 Wis. 2d 1, 7–8, 271 N. W. 2d 598, 601 (1978) ('The historic common-law right of a master to recover for loss of services due to a servant's injury by a negligent third party contemplated a quasi-familial relationship which does not exist between a modern-day employer and his employee. The action, however valid in feudal societies, is out of place in modern times.'); *Crab Orchard Improvement Co. v. Chesapeake & Ohio Ry. Co.*, 115 F.2d 277, 282–83 (4th Cir. 1940) (noting that while the employer's tort theory of recovery was based on 'the ordinary principle of tort-liability—that appellee's negligence was the proximate cause, in a chain of causation, resulting in damage to the appellant,' the courts 'have quite uniformly treated such damages as too remote and too indirect to support a recovery' by an employer when an employee is negligently injured); *Preiser Sci., Inc.*

[¶30] From either perspective—duty or causation—all of CCR's claims fail so that summary judgment was properly granted as to this defendant.

---

*of Ohio v. Piedmont Aviation, Inc.*, 432 F.2d 1002, 1002 (4th Cir. 1970) (affirming the district court's finding that each of the plaintiff corporations lacked a cause of action 'either at common law or under the statutes of West Virginia' in a case alleging 'loss of [employee] services' as a result of defendant's negligence); *Cont'l Cas. Co. v. P.D.C., Inc.*, 931 F.2d 1429, 1431 (10th Cir. 1991) (finding that 'New Mexico would stand with a majority of jurisdictions' that refuse to recognize an employer's right to recover in tort, noting that a contrary rule would 'suggest that every employer faced with the lack of work force due to employee injury has a cause of action against the one responsible for the injury' (citing cases)); *Love's Estate v. Gen. Motors Corp.*, 14 Fed. Appx. 808, 810 (9th Cir. 2001) ('[W]e simply do not accept that the Arizona Supreme Court would become the first court in the nation to recognize an employer's right of recovery against a tortfeasor for damages caused by an injury to an employee.'); *I.J. Weinrot & Son, Inc. v. Jackson*, 40 Cal. 3d 327, 329, 340, 708 P.2d 682, 683, 690–91 (1985) (rejecting a claim under a California statute codifying the common law in a case where a 'key employee' was injured by a third party's negligence, and explaining several reasons for applying the statute narrowly, including: (1) the cause of action is 'obsolete, archaic and outmoded'; and (2) public policy reasons, to include the fact that the 'corporation was peculiarly able to calculate the risk of loss of services of a key employee and to protect itself against such a loss by securing key employee insurance'); *Lusby v. Union Pac. R.R. Co.*, 4 F.3d 639, 642–43 (8th Cir. 1993) (finding that although the special relationship between a parent and child allows a father to 'recover damages if he shows his [deceased] son would have performed services *for the father*,' because the father was a sole shareholder of a corporation and his son worked *for the corporation*, the father 'cannot recover for his corporation's loss of a key employee' as the lost earnings would have gone to the father 'only in his capacity as the corporation's sole shareholder') (emphasis added); 12B Michie's Jurisprudence of Virginia and West Virginia, Master and Servant § 101 (2017) ('An employer may not maintain an action to recover damages from a tort-feasor for the loss of services of his employee when such action is based on the negligent injury of the employee by such tort-feasor.'); 2A American Law of Torts § 9:68 ('[I]n a vast number of cases . . . the courts have either expressly or impliedly held that an employer had no cause of action against a third person for damages for loss of services or profits resulting from injuries to an employee caused by the *negligence* of the third person.').

*Windows & Walls by Christine, LLC v. Xanterra Kingsmill, LLC*, No. 4:17CV131, 2018 WL 1724786, at *2 (E.D. Va. Mar. 21, 2018) (footnotes omitted).

### 2. The record evidence does not support the claim that Lozanov's damages were caused by Piel's conduct.

[¶31] Both CCR's and Lozanov's theories of causation rest upon the allegation that Piel's disclosure of Lozanov's Way Wind payments caused Lozanova to file her post judgment motion in the related divorce action, which they claim caused Lozanov direct harm and CCR derivative harm. Setting aside the problem with respect to the attenuated nature of the harm claimed by CCR as discussed above, *see supra* ¶¶ 29-35, to survive summary judgment, this theory of causation must be supported by admissible prima facie evidence. *See Yankee Pride Transp. & Logistics, Inc.*, 2021 ME 65, ¶ 13, 264 A.3d 1248. It is not.

[¶32] When asked during his deposition how he connected Piel's conduct to his damages, Lozanov speculated, without personal knowledge, that Piel's disclosure of his emails caused Lozanova to file her motion to modify the divorce judgment. There is no admissible evidence in the record to support this speculation. The only admissible evidence in the summary judgment record indicates that Lozanova filed her motion because of concerns regarding Lozanov's parenting.

[¶33] In addition, Lozanov's alleged damages—primarily a stress-related reaction to receiving discovery requests—flow from the

post-divorce judgment litigation, and damages related to the stress of litigation are generally unrecoverable. *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 79 (1st Cir. 2001) ("Even though the [Massachusetts Supreme Judicial Court] has not passed directly on the point, the heavy weight of authority holds that litigation-induced stress is not ordinarily recoverable as an element of damages."); *see also Stoleson v. United States*, 708 F.2d 1217, 1223 (7th Cir. 1983) ("It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages."); *Picogna v. Bd. of Educ. of Cherry Hill*, 671 A.2d 1035, 1037-38 (N.J. 1996) (collecting cases that show the weight of authority is against awarding damages related to litigation-induced stress).

[¶34] Thus, summary judgment was properly granted as to all the claims asserted by both plaintiffs that required prima facie evidence of actual damage, i.e., all the claims except Lozanov's cause of action for intrusion into seclusion, discussed below. *See infra* ¶¶ 36-40.

**C.** **The undisputed facts do not support the essential elements of the tort of intrusion into seclusion.**

[¶35] We address this claim separately because nominal damages can be awarded for this tort.[6] *See Knight v. Penobscot Bay Med. Ctr.*, 420 A.2d 915, 919 (Me. 1980) (discussing the failure to instruct the jury about nominal damages in an invasion of privacy case); *Cason v. Baskin*, 30 So. 2d 635, 636 (Fla. 1947) (referencing "an unwarranted invasion of plaintiff's right of privacy, such as would authorize the recovery of at least nominal damages.").[7]

[¶36] To survive summary judgment on this claim, Lozanov must present prima facie admissible evidence of an (1) intentional, (2) intrusion, (3) upon premises occupied privately by him for purposes of seclusion, and (4) the intrusion must be highly offensive to a reasonable person. *Lougee Conservancy*, 2012 ME 103, ¶ 16, 48 A.3d 774.

---

[6] Lozanov did not specifically request nominal damages in his pleadings, and he has not argued to us that his claim should survive summary judgment in the absence of actual damages. Hence, the issue arises of whether he waived the argument that the potential availability of nominal damages should defeat summary judgment as to this claim, and in oral argument, Piel argued that the issue had been waived. *See Oliver v. Falla*, 258 F.3d 1277, 1280-81 (11th Cir. 2001) (discussing waivers of nominal damages); *Am. C.L. Union of Massachusetts v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 n.7 (1st Cir. 2013) (concluding that a request for nominal damages was waived by not arguing the matter in the party's brief). Because the cause of action does not survive as a matter of law in any event, we need not address this issue.

[7] Nominal damages may also be awarded for trespass to chattels, but only when, unlike here, the claim rests on dispossession. *See* Restatement (Second) of Torts § 218 cmt. d (Am. L. Inst. 1965) ("He may recover at least nominal damages for the loss of possession.").

[¶37] Lozanov argues that his emails were premises that he occupied privately for seclusion and to conclude otherwise would eschew modern interpretations of the Restatement (Second) of Torts § 652B (Am L. Inst. 1977).[8] Here, however, the record reflects that there were multiple people on the email chain intruded upon, with no indication of who they were or what their responsibility was regarding the privacy of the emails. Although Lozanov testified that he signed an NDA related to the Way Wind project, there is no evidence that any of the other recipients of the email were subject to similar restrictions. Further, despite the record being clear that Piel explicitly agreed not to view emails unrelated to CCR business, the only evidence regarding how Piel could distinguish between the emails she was allowed to open and those that were off-limits was to look at the recipients of the emails. There is no indication whether Piel could determine the recipients from the inbox, without opening the emails. Finally, the overarching fact remains that despite Lozanov's warnings to Piel to refrain from examining all non-CCR emails, he gave her access to his personal account. Irrespective of his warnings, this act diminished Lozanov's expectation of privacy in those emails. *See Clark v. Teamsters Loc. Union 651*, 349 F. Supp. 3d 605, 622 (E.D. Ky. 2018) (employee

---

[8] The Restatement includes opening private and personal "mail" as a type of invasion that may support the tort. Restatement (Second) of Torts § 652B cmt. b. (Am. L. Inst. 1977).

did not have a reasonable expectation of privacy in file storage service account, which contained a mixture of personal and work-related documents and was tied to her work email address.); *McLaren v. Microsoft Corp.*, No. 05-97-00824-CV, 1999 WL 339015, at *4 (Tex. Ct. App. May 28, 1999) (rejecting intrusion into seclusion claim where plaintiff's personal emails were placed by the plaintiff on her employer's network although located in separate personal folders, noting that the emails were "at some point accessible by a third-party"); *Garrity v. John Hancock Mut. Life Ins. Co.*, No. CIV.A. 00-12143-RWZ, 2002 WL 974676, at *2 (D. Mass. May 7, 2002) (same).

[¶38]  Prosser and Keeton's seminal treatise on the law of torts explains that "the means used" during an alleged intrusion is the first factor in considering whether there has been an actionable invasion of privacy.  Keeton et al., *Prosser and Keeton on the Law of Torts* § 117 at 856 (5th ed. 1984).  If the means are abnormal, then the resulting intrusion is likely actionable.  *Id.*  Here, however, Lozanov gave Piel access to all the email accounts, and she would have seen the emails regarding Way Wind come into the common inbox.  This is hardly an abnormal manner of viewing emails.

[¶39]  In sum, there was insufficient evidence to establish a prima facie case of the elements of the tort, and the court properly granted summary judgment as to this cause of action.

**D.  Public policy supports the grant of summary judgment.**

[¶40]  Finally, we note that Lozanov and CCR are essentially arguing that they are entitled to recover for Piel's intrusion and disclosure because her actions defeated Lozanov's effort in his post-judgment family proceeding to hide the fact that he had received the Way Wind payments.

[¶41]  "It is well settled, that the common law will afford no aid to a party whose claims can be successfully enforced only by a violation of its principles, or in direct contravention of a statutory enactment."  *Lord v. Chadbourne*, 42 Me. 429, 439 (1856) (Appleton J., opinion); *see also Wheeler v. Russell*, 17 Mass. 258, 281 (1821) ("No principle of law . . . is better settled than that no action will lie upon a contract made in violation of a statute, or of a principle of the common law.")

[¶42]  Limits on recovery based on public policy are essentially legal limits on the scope of liability.  *See* Keeton et al., *Prosser and Keeton on the Law of Torts* § 41 at 264.  Hence, whether recovery is barred by public policy is appropriately decided by the court.  *See Pfeifer v. Standard Gateway Theater*,

55 N.W.2d 29, 35 (Wis. 1952) ("[I]t is then for the court to decide as a matter of law whether or not considerations of public policy require that there be no liability.").

[¶43] In a related context, we have concluded that premarital agreements limiting attorney's fees are unenforceable on public policy grounds when the limitation "could stifle a court's ability to address issues affecting the best interest of the child." *Riemann v. Toland*, 2022 ME 13, ¶ 37, 269 A.3d 229. Hiding assets in a proceeding to determine the support appropriate for a child is not in the child's best interests and is contrary to public policy. *See* 4 M.R.S. § 1551 (2024); 19-A M.R.S. § 1653 (2024); *Pendexter v. Pendexter*, 363 A.2d 743, 748 (Me. 1976) (Dufresne, C.J., concurring) ("Public policy is of prime consideration in all procedures relating to divorce and it is most important that the judicial process within delegated legislative authority be given such flexibility as will allow implementation of the State's role of parens patriae in promoting the best interests and welfare of minor children, especially after the family unit has been severed through divorce of the parents.").

[¶44] As we stated in *Lord*, 42 Me. at 434:

[T]he law will say, our forms and rules are established to protect the innocent and to vindicate the injured, not to aid offenders in the execution of their unjust projects; and you must not have the aid of

law to rid you of an inconvenience which is a suitable punishment of your offence.

(Quotation marks omitted.)

The entry is:

Judgment affirmed.

———————————————

Christopher K. MacLean, Esq. (orally), Dirigo Law Group LLP, Camden, for appellants Capital City Renewables, Inc., and Kiril Lozanov

Tyler J. Smith, Esq. (orally), Libby O'Brien Kingsley & Champion, LLC, Kennebunk, for appellee Lily Birgitta Piel

Waldo County Superior Court docket number CV-2022-3
FOR CLERK REFERENCE ONLY